## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DEVIN RAGLAND,**
        **Plaintiff,**

v.                                                          Case No. 13-C-1118

**CITY OF MILWAUKEE, et al.,**
        **Defendants.**

---

## DECISION AND ORDER

Devin Ragland claims that three officers of the Milwaukee Police Department—Amy Bartol, Stephanie Seitz, and Douglas Anderer—subjected him to unreasonable searches in violation of the Fourth Amendment to the United States Constitution and are liable for damages under 42 U.S.C. § 1983.[1] In addition to suing these officers, Ragland sues the City of Milwaukee for municipal liability under § 1983. Before me now is the defendants' motion for summary judgment.[2] I must grant the motion if the defendants show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

---

[1]Ragland named a fourth officer, Alan Carsky, as a defendant in his complaint. However, Ragland is no longer pursuing claims against Carsky and therefore he will be dismissed as a defendant.

[2]Also before me is plaintiff's motion for leave to file an amended complaint.

# I. BACKGROUND

On June 23, 2011, sometime between 5:00 p.m. and 7:00 p.m., Officers Stephanie Seitz and Amy Bartol were on patrol in a squad car in Milwaukee's seventh police district when they encountered a vehicle in which Ragland was a passenger. The parties have different views of the facts surrounding this encounter.

**A.     Defendants' Version**

According to the officers, while they were on patrol they observed the vehicle in which plaintiff was a passenger "driving recklessly." Def. Prop. Findings of Fact ("PFOF") ¶ 9. They began to follow the vehicle and felt that the driver of the vehicle "was trying to elude police by making several different turns." Id. ¶ 10. Eventually, the officers observed the vehicle pull into an alley and park in a parking stall behind a residence. The neighborhood in which the residence was located is a high-crime area. One of the car's occupants exited the vehicle, which for reasons the officers do not explain they interpreted as "an attempt to flee." Id. ¶ 13. At some point, a tenant of the building approached the officers with a child and told them that she did not know the occupants of the vehicle and that "they should not be there." Id. ¶ 14. Bartol also observed either the driver of the vehicle or the front passenger "leaning inward towards the center area of the vehicle," which for reasons she does not explain she deemed "suspicious." Id. ¶ 15. By this point, Bartol and Seitz had decided to conduct a stop of the vehicle. They called for backup and then approached the vehicle.

Ragland was seated in the rear passenger seat, behind the driver. Quamari Carr, Ragland's cousin, was the driver of the vehicle, and Tevin Johnson, Ragland's brother, was

2

in the front passenger seat. During a discussion with these young men, Officer Seitz observed what she thought was synthetic or "K2" marijuana in the middle front compartment of car's interior, between the driver and the front-seat passenger. Eventually, Officer Bartol asked the driver to exit the vehicle, and he complied. Bartol then conducted a patdown search of the driver. At some point, she also conducted a patdown search of the passenger. During these searches, Bartol found a single bullet and some marijuana.

Having found the bullet but no firearm, Bartol felt that Ragland might be armed. For this reason, she decided to pat him down. According to Bartol, she performed the search with a "bladed hand technique" over Ragland's clothing. Def. PFOF ¶¶ 26, 35. Before she began the search, she asked for Ragland's identification and learned that he was under the age of eighteen. During the search, she discovered a pack of cigarettes in Ragland's outer pocket. Because Ragland was under eighteen, his possession of cigarettes amounted to an ordinance violation. Also during the search, Bartol thought she felt a hard object in Ragland's crotch. She did not know what it was so she continued with her search from the other side using her bladed hand. Id. ¶ 37. Bartol informed Seitz that she may have found something but that she was not sure. Bartol asked Seitz whether she wanted to do a patdown search of Ragland to see if she could locate a weapon. Seitz does not recall whether she performed her own patdown search.

At this point, Officers Anderer and Carsky arrived on the scene in response to the call for backup. Carsky took one of the individuals back to the police wagon. Bartol informed Anderer that a bullet and marijuana had been found during the searches of the driver and front passenger. She also informed Anderer that while a gun had not yet been recovered, she felt a hard object with the back of her hand during her search of Ragland.

3

Anderer does not recall whether he searched Ragland. Eventually, the officers decided to arrest Ragland for being a minor in possession of cigarettes.

**B.     Plaintiff's Version**

According to Ragland, on the evening he was searched, he and Johnson and Carr were out driving for about an hour before they encountered the police. Carr was the driver, and according to Ragland, Carr was not driving erratically, recklessly, or in excess of the speed limit. Eventually, the three young men arrived at Carr's aunt's house and parked the vehicle in the driveway off of the alley. Prior to pulling into the driveway, Ragland was unaware of any police vehicles in the area and had not observed any police lights or heard any sirens. Carr exited the vehicle and began walking toward the back of his aunt's house; Ragland and Johnson remained in the vehicle. Ragland Decl. ¶ 8.

While Carr was on his way to the door of his aunt's house, Bartol and Seitz pulled up in a marked squad car, exited the squad with weapons drawn, and ordered Carr to return to the vehicle. Carr complied. Bartol then approached Carr, searched him, and recovered marijuana and a single bullet. She handcuffed Carr and placed him in the back of the squad car. Next, Seitz ordered Johnson out of the car. When Johnson complied, Bartol searched him and put him into the squad car.

Bartol and Seitz then ordered Ragland to get out of the car, and he complied. The officers ordered him to put his hands on the trunk of the car and spread his legs, and he complied. Bartol conducted a patdown search of Ragland's arms, torso, legs, and buttocks area, and removed a pack of cigarettes from his front pants pocket. According to Ragland, the officers then ordered him to pull down his jeans. Ragland was wearing jeans over a pair of basketball shorts, and underneath the basketball shorts he was wearing a pair of

4

boxers. Plaintiff complied with the order and pulled his jeans down to his ankles. The basketball shorts and boxers remained up. Bartol then searched plaintiff a second time. During this search, she grabbed the plaintiff's testicles over his basketball shorts and boxers and squeezed them approximately five times. Ragland Dep. at 47–49. Ragland heard Bartol tell Seitz that she thought she felt something, and then Seitz searched the plaintiff by squeezing his testicles approximately three times. Id. at 50–52. The officers did not find any weapons or additional contraband during these searches. Several members of the public were standing on a nearby street corner and watched Bartol and Seitz search plaintiff with his jeans down. Pl. PFOF ¶ 22.

A short time later, Officers Anderer and Carsky arrived on the scene in response to the call for backup. Anderer approached Ragland, whose jeans remained around his ankles, and conducted a patdown search. Anderer then pulled back the waistbands of Ragland's basketball shorts and boxers and looked inside both the front and the back, at Ragland's genitals and buttocks. Id. ¶ 25. Anderer located no weapons or contraband during this search. The officers instructed Ragland to pull up his jeans, and they arrested him for possession of the cigarettes.

## II. DISCUSSION

### A.     Claims for Unreasonable Search and Seizure

The plaintiff's claims for unreasonable search and seizure against Officers Bartol, Seitz, and Anderer involve several distinct Fourth Amendment issues: (1) the legality of the initial stop of the vehicle, (2) the legality of the patdown search of Ragland for weapons, during which the officers discovered cigarettes; (3) the legality of Bartol and Seitz's

5

allegedly requiring Ragland to pull down his jeans and their searching Ragland's crotch area; and (4) the legality of Anderer's allegedly pulling back the waistbands of Ragland's basketball shorts and boxers and viewing his crotch and buttocks. I consider the legality of each step in turn.

Because the officers assert the defense of qualified immunity, I also consider whether they are entitled to summary judgment on that basis. An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. Ashcroft v. al–Kidd, 563 U.S. __, 131 S.Ct. 2074, 2080 (2011). A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. Id. at 2083–84. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." Id. In addition, the Supreme Court has repeatedly emphasized that clearly established law must not be defined at a high level of generality, id., at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. Plumhoff v. Rickard, __ U.S. __, 134 S. Ct. 2012, 2023 (2014).

1.   **Initial traffic stop**

The first question is whether Bartol and Seitz were justified in conducting a stop of the vehicle in which Ragland, Carr, and Johnson were traveling.[3] A brief investigatory stop

---

[3]The plaintiff has filed a motion to amend his complaint to specifically challenge the initial stop of the vehicle and the subsequent frisk that resulted in the discovery of the

is permitted under the Constitution when it is based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Riley, 493 F.3d 803, 808 (7th Cir. 2007). Officers, therefore, may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot. Riley, 493 F.3d at 808. Reasonable suspicion amounts to something less than probable cause but more than a hunch. Id. When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. Id.

At the summary judgment stage, I must view the facts in the light most favorable to the plaintiff. Thus, in determining whether the officers had reasonable suspicion to stop the vehicle, I accept Ragland's version of events as true. Under his version, the vehicle in which he was a passenger was not driving recklessly, as the officers contend. The officers suggest that because Ragland was not the driver of the vehicle, he lacks personal knowledge of whether it was being driven recklessly. However, a passenger of a vehicle would certainly know whether he was riding in a vehicle that was being driven in a reckless fashion. The officers also state that the vehicle appeared to be trying to elude police by

---

cigarettes. See Fed. R. Civ. P. 15. However, this amendment is unnecessary, as the original complaint contains enough allegations to have put the defendants on notice that the legality of the stop and frisk was at issue. Indeed, the defendants fully explored this issue during discovery and have briefed it in their motion for summary judgment. In any event, allowing the plaintiff to amend his complaint at this point could not possibly prejudice the defendants for, as noted, they already fully addressed this issue during discovery and in their motion for summary judgment. Thus, I will grant the plaintiff's motion to formally add the allegations concerning the initial stop and frisk to his complaint.

"making several different turns." Def. PFOF ¶ 10. It is unclear to me why making turns could be thought to be elusive or otherwise suspicious behavior. Perhaps turning would be suspicious if the vehicle were turning corners at an excessive rate of speed or repeatedly circling a block, but the officers do not state that the vehicle they were following did anything like that. According to Ragland, the occupants never noticed the police or discussed the fact that a police vehicle was following them, Ragland Decl. ¶¶ 6–7, and thus they did not attempt to elude police. When the vehicle parked in the driveway of Carr's aunt's house, Carr did exit the vehicle, but not for the purpose of fleeing, as the officers contend. Rather, Carr was simply going into his aunt's house. Id. ¶ 8. The officers do not explain what it was about Carr's behavior in exiting the vehicle that caused them to think he was attempting to flee. Officer Bartol also states that she saw one of the occupants of the vehicle lean inwards toward the center area of the vehicle, and that she found that suspicious. Again, however, it is not clear how a reasonable officer could consider leaning to be suspicious behavior. In any event, Ragland denies that any of the vehicle's occupants leaned toward the center of the vehicle. Id. ¶ 10.

Still, there is one fact that likely gives rise to reasonable suspicion, and that is the tenant's informing the officers that she did not know the occupants of the vehicle and that they should not be there. Def. PFOF ¶ 14. Ragland acknowledges that a woman and her child were present at the scene, although he did not see the woman speak to the officers. Ragland Decl. ¶ 9. However, Ragland did not notice the officers until they ordered Carr to return to the vehicle, and by that point the conversation between the officers and the tenant would already have occurred. Thus, the woman's having talked to the officers is

8

consistent with Ragland's version of events, and I conclude that there is no genuine dispute as to this fact.[4]

Once the tenant informed the officers that the vehicle was not authorized to be in the driveway, the officers had reasonable suspicion to investigate further, as they then had more than a "hunch" that the vehicle was illegally parked or that its occupants were trespassing or about to trespass. See Foley v. Kiely, 602 F.3d 28, 32 (1st Cir. 2010) (officers permitted to conduct investigatory stop when they had reason to believe that plaintiff was trespassing in park). In any event, even if a jury could reasonably conclude that the officers did not have reasonable suspicion to conduct an investigatory stop of the vehicle's occupants, the officers would be entitled to qualified immunity. The plaintiff has not cited, and I have not found, a case suggesting that officers do not have reasonable suspicion to conduct an investigatory stop of a vehicle parked in a driveway of a residence when a tenant of the residence informs the officers that the vehicle should not be there. Accordingly, Officers Bartol and Seitz are entitled to summary judgment on the issue of whether their investigatory stop of the occupants of the vehicle was lawful.

**2. Frisk of plaintiff**

Next, I address whether Officer Bartol was justified in frisking Ragland for weapons. To proceed from a stop to a frisk, an officer must have reasonable suspicion that the person stopped is armed and dangerous. Arizona v. Johnson, 555 U.S. 323, 326–27 (2009).

---

[4]I suppose it is possible that the officers are lying about what the tenant told them, but a nonmovant cannot avoid summary judgment simply by positing that a witness may be lying. See, e.g., Muhammed v. City of Chicago, 316 F.3d 680, 683–84 (7th Cir. 2002).

9

It is undisputed that by the time Ragland was frisked, the officers had already frisked the other two occupants of the vehicle and discovered some marijuana and a single bullet. The officers contend that once they found the bullet, they had reasonable suspicion to think that someone had a gun and therefore reasonably suspected that Ragland was armed. Ragland contends that this line of reasoning involves an impermissible use of guilt by association—the officers could not use the fact that they found a bullet on another person to support an inference that he might be armed. I disagree. All three men were traveling in the same vehicle, and if one of them had ammunition, it was reasonable for the officers to fear that one or more of the others had a gun or that a gun was located in the vehicle itself. See People v. Coylar, 996 N.E.2d 575, 585–87 (Ill. 2013) (holding that once officer observed single bullet on center console of vehicle, officer was justified in performing patdown search of occupants and searching passenger compartment of vehicle). Thus, I conclude that, as a matter of law, Bartol reasonably suspected that Ragland was armed and dangerous, and that therefore she was justified in conducting a patdown search of Ragland for weapons. To the extent that my conclusion is incorrect, Bartol would be entitled to qualified immunity, as Coylar demonstrates that it has not been clearly established that finding a single bullet does not provide justification to conduct a patdown for weapons of those in the vicinity of the bullet.

Ragland does not contend that Bartol exceeded the scope of a permissible patdown search when she found the cigarettes in his pocket, that Bartol did not immediately recognize the cigarettes through "plain feel," see Minnesota v. Dickerson, 508 U.S. 366 (1993), or that at the time of the patdown Bartol did not know that Ragland was under

eighteen and that therefore his possession of cigarettes was an ordinance violation. Thus, I conclude that Bartol's discovery and seizure of the cigarettes as evidence was lawful.

### 3. Bartol and Seitz's searches of plaintiff's genital area incident to arrest

The defendants contend that once they found Ragland's cigarettes, any subsequent search was conducted as a search incident to a lawful arrest, see, e.g., United States v. Robinson, 414 U.S. 218, 235 (1973) (full search of person incident to lawful arrest is reasonable under the Fourth Amendment), and Ragland does not dispute this contention. However, Ragland contends that Bartol and Seitz exceeded the scope of a permissible search incident to an arrest when they ordered him to pull down his jeans and squeezed his testicles through his basketball shorts and boxers.

When a person is lawfully arrested, a police officer may conduct a "relatively extensive exploration of the person" to find weapons or evidence of a crime. Id. at 227, 235. However, a search incident to an arrest can become unreasonable if it is conducted in a manner that is "extreme or patently abusive." Campbell v. Miller, 499 F.3d 711, 717 (7th Cir. 2007) (quoting Robinson, 441 U.S. at 236). Ragland does not contend that, in searching his genital area, Bartol and Seitz behaved in a manner that suggested they were doing so for sexual gratification or to humiliate him. Rather, he acknowledges that Officer Bartol thought she felt something in the area of his crotch, and that therefore the search was conducted in order to locate weapons or additional contraband—a permissible purpose when the search is being conducted incident to a lawful arrest. The Seventh Circuit has found that a search of a suspect's crotch incident to an arrest is permissible so long as the suspect's private parts are not exposed to onlookers. United States v. Brown, 233 F. App'x 564, 568 (7th Cir. 2007). Here, although onlookers were present and

11

Ragland had been forced to pull down his jeans, it is undisputed that Ragland was wearing basketball shorts under his jeans, and that therefore neither his underwear nor his private parts were exposed. See also Maldonado v. Pierri, No. 08 C 1954, 2010 WL 431478, at *2, 7 (N.D. Ill. Feb. 1, 2010) (concluding that search incident to arrest in which officer reached inside arrestee's pants, briefly shook his crotch area, and pulled down his pants a few inches was reasonable where officer was searching for a weapon and did not expose arrestee's private parts).

The plaintiff cites to cases in which courts held that officers may have violated the Fourth Amendment by squeezing a suspect's testicles, but those were excessive-force cases in which the officers inflicted unnecessary physical pain on the suspects by squeezing their testicles. See Price v. Kramer, 200 F.3d 1237, 1249 (9th Cir. 2000); Teas v. McCallen, No. 5:12–CV–134, 2013 WL 2422783, at *16 (N.D.W. Va. June 3, 2013).[5] Ragland does not contend that the officers squeezed his testicles harder than necessary to determine whether he had hidden a weapon or evidence of a crime in that area, and he does not contend that the officers caused him any physical pain.

It might be possible for a jury to reasonably conclude that Bartol and Seitz exceeded the bounds of a permissible search incident to an arrest because they did not need to squeeze Ragland's testicles in order to determine whether he was armed or concealing evidence of a crime; rather, they could have performed some lesser intrusion such as patting him down with a flat hand in the area of his crotch. However, even if a jury could so conclude, the officers would be entitled to qualified immunity. Cases such as Brown

---

[5]In addition, Teas is distinguishable because it involved an investigative stop rather than a search incident to an arrest. 2014 WL 2422783, at *16.

and Maldonado indicate that a search of an arrestee's crotch incident to an arrest—even a search that involves "shaking" the crotch area, see Maldonado, 2010 WL 431478, at *2, 7—is permissible so long as the arrestee's private parts are not exposed to onlookers, and the plaintiff has not cited to any cases clearly establishing that the Fourth Amendment prohibits an officer from squeezing an arrestee's testicles during a search incident to an arrest when the search is performed for the purpose of locating weapons or evidence and not for purposes of sexual gratification or humiliation or to cause the arrestee physical pain. Accordingly, Bartol and Seitz are entitled to summary judgment.

**4.     Anderer's search of plaintiff's crotch and buttocks incident to arrest**

Ragland's final alleged Fourth Amendment violation is Anderer's pulling back the waistbands of his basketball shorts and boxers and viewing his crotch and buttocks. This search, assuming it occurred, was a search incident to an arrest. As with Bartol and Seitz's searches of Ragland's testicles, the question with respect to Anderer is whether his search was extreme or patently abusive. Campbell, 499 F.3d at 717.

I find it difficult to characterize Anderer's search as extreme or patently abusive. It is undisputed that before Anderer performed the search, Officer Bartol informed him that a bullet and marijuana had been found on one of the vehicle's other occupants, that no gun had yet been recovered, and that she had felt a hard object in Ragland's genital region during her search. Def. PFOF ¶ 43. Thus, Anderer had a reasonable basis for conducting a search of Ragland's crotch and buttocks, and Ragland does not contend that he performed the search for purposes of sexual gratification or to humiliate him. Moreover, although Anderer viewed plaintiff's private parts, he did not expose his privates or

underwear to onlookers. For this reason, his search was no more intrusive than the search the Seventh Circuit deemed lawful in Brown. See 233 F. App'x at 568–69.

Ragland cites a handful of cases involving searches of suspects or arrestees in which the officer exposed the suspect's or arrestee's undergarments or private parts. Two of these cases involved conduct that was much more intrusive than Anderer's search of Ragland. In the first case, Banaei v. Messing, the officers forced a woman "to undress before an audience of men and women for their amusement." 547 F. App'x 774, 777 (7th Cir. 2013). In the second case, Campbell v. Miller, officers brought the arrestee into an open backyard, in plain sight of his friend and several neighbors. They then undid his belt buckle, pulled his pants partway down, and had him lean forward. One of the officers proceeded to separate Campbell's buttocks and perform a visual inspection of his anal cavity. Id. at 713–15. Neither of these cases suggest that Anderer's pulling back the waistbands of Ragland's shorts and boxers and briefly viewing his crotch and buttocks without exposing them to onlookers was extreme or patently abusive.

The plaintiff cites one case that is somewhat similar to the conduct at issue here. In Carmichael v. Village of Palatine, an officer found crack cocaine in the plaintiff's vehicle. He then performed a search of the plaintiff's person, during which he unbuttoned the plaintiff's pants and lowered them to mid-thigh, pulled the plaintiff's underwear out, and directed his flashlight on and looked at the plaintiff's genitals. No. 07 C 5221, 2011 WL 528894, at *1 (N.D. Ill. Feb. 8, 2011). The officer then told the plaintiff to bend over. When the plaintiff complied, the officer pulled out the plaintiff's underwear and directed his flashlight on and looked at his buttocks. Id. Two female passersby observed these events.

14

Id. The district court determined that whether the search was unreasonably intrusive raised an issue of fact for trial. Id. at *2–3.

Although somewhat similar to this case, Carmichael involved a search that was more intrusive than Anderer's search of Ragland. In Carmichael, the officer exposed the plaintiff's underwear in a manner that allowed two female passersby and possibly others to see. Here, Ragland's underwear was not exposed to onlookers. I also note that in Carmichael the officer did not contend that exigent circumstances required searching the plaintiff in this manner in a public place. Id. at *3. In the present case, Anderer had a reasonable basis to think Ragland might be armed, and the plaintiff does not cite a case indicating that the Fourth Amendment requires an officer to transport a potentially armed suspect to a private place before confirming that he is not, in fact, armed.

In any event, Carmichael is an unpublished district-court case, not binding precedent, and I am not persuaded by its reasoning. The court thought that the search of the plaintiff was "comparatively intimate" to the search conducted by the officers in Campbell. See Carmichael, 2011 WL 528894, at *2. However, as just discussed, the search in Campbell involved a search of the plaintiff's bare buttocks and anal cavity in plain view of the plaintiff's friend and neighbors. I find it hard to characterize a search in which only the plaintiff's underwear was exposed to onlookers and in which the officer pulled back the plaintiff's underwear to view the plaintiff's genitals and buttocks as comparatively intimate to a public anal-cavity inspection.

Because of the relatively unobtrusive nature of Anderer's search of Ragland's crotch and buttocks, I conclude that a jury could not reasonably conclude that the search exceeded the scope of a permissible search incident to an arrest. In any event, even if

15

a jury could so conclude, Anderer would be entitled to qualified immunity. Carmichael is the only case that comes close to finding a constitutional violation on facts similar to Anderer's search of Ragland, and a single district court case cannot clearly establish a constitutional right. Hall v. Sutton, 581 F. App'x 580, 582–83 (7th Cir. 2014). Accordingly, Anderer is entitled to summary judgment.

**B.    Municipal Liability**

Under Monell v. Department of Social Services, 436 U.S. 658, 690 (1978), municipalities and other local governmental units are "among those persons to whom § 1983 applies." Monell, however, places a substantial limitation on this liability. A municipality "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. Rather, municipal governments may be sued only when their officers inflict an injury in the execution of the government's policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. at 694. To show that a municipal policy was the cause of the plaintiff's constitutional injury, the plaintiff must demonstrate that the policy was the "moving force" behind the violation. Id.

In the present case, the plaintiff's claim for municipal liability is ill-defined and poorly supported. The plaintiff seems to claim that the City of Milwaukee is liable under § 1983 for any illegal search or seizure ever committed by any of its officers because the department supports "aggressive policing." Pl. Br. in Opp. at 38–39. But the plaintiff points to no evidence showing that a component of the department's policy of aggressive policing includes encouraging officers to conduct searches or seizures that violate the Fourth

16

Amendment. Rather, the policy involves "increased traffic stops and field interviews of people in the community." Pl. PFOF ¶ 38. No evidence suggests that the department does or has encouraged officers to increase the number of such stops and interviews by performing unreasonable searches and seizures.

The plaintiff asserts that a custom of conducting illegal strip and body-cavity searches arose among certain officers in the Fifth District of the Milwaukee Police Department. However, the plaintiff has not produced admissible evidence that supports this assertion, such as affidavits from individuals who claim that they were subjected to illegal strip and body-cavity searches. Rather, the plaintiff cites to allegations made in complaints and other forms of inadmissible hearsay, which could not be considered by a jury at trial.[6] See Pl. PFOF ¶¶ 52–85. Thus, the plaintiff has failed to raise an issue of fact as to whether a custom of conducting illegal strip or body-cavity searches arose in the Fifth District or anywhere else in the City of Milwaukee.[7]

The plaintiff also contends that the City of Milwaukee is liable because it failed to properly train its officers on when and how they could conduct strip or body-cavity searches. A municipality's failure to train its officers can be grounds for liability under § 1983, but only if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers

---

[6]The plaintiff asserts that Edward Flynn, the Chief of Police, has "acknowledged" that one officer in the Fifth District was involved in "a pattern of conducting illegal searches," Pl. PFOF ¶ 54, but the evidence cited in support of this assertion—page 125 of Flynn's deposition—contains no such acknowledgment.

[7]This does not mean that such a custom did not exist, only that the plaintiff has failed to carry his burden to produce admissible evidence from which a reasonable jury could conclude that the custom existed.

17

of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989). Assuming that the City did fail to train its officers on when and how to conduct strip and body-cavity searches, the plaintiff has not shown that the City's failure was the moving force behind any constitutional violations that may have occurred in this case. The only conduct that occurred in this case that a jury could deem unreasonable was Bartol and Seitz's searching the plaintiff's crotch over his clothing. I do not understand the plaintiff to be contending that this constituted a strip search or a body-cavity search or that the City of Milwaukee should have trained its officers not to search an arrestee's crotch over his or her clothing during a search incident to an arrest. Although plaintiff claims that Anderer's pulling back the waistbands of his shorts and boxers was a strip search, I have determined that such conduct did not amount to a constitutional violation. Moreover, as discussed in the context of qualified immunity, even assuming that the conduct of Bartol, Seitz, and Anderer was unconstitutional, such conduct did not involve the violation of any clearly established rights. Thus, a jury could not reasonably conclude that it would have been "obvious" to City policymakers that training on how to avoid infringing those rights was necessary.

The plaintiff also contends that the City is liable because it failed to "adequately hire, discipline, supervise, monitor, and control" its officers. Br. in Opp. at 38. However, the evidence the plaintiff cites in support of this claim does not in any way connect to Officers Bartol, Seitz, or Anderer and to their actions in this case.[8] See Pl. PFOF ¶¶ 137–236.

---

[8]The plaintiff contends that Seitz lied to cover for another officer accused of conducting an illegal body-cavity search and that the City of Milwaukee failed to discipline her for lying. See Pl. PFOF ¶¶ 68–75. However, both the alleged lying and the alleged failure to discipline occurred after Seitz's search of Ragland. Thus, even if the City had

18

Moreover, the plaintiff has not pointed to evidence from which a reasonable jury could conclude that if the City did not have inadequate policies concerning the hiring, discipline, supervision, monitoring, or control of its officers, the specific constitutional violations that may have occurred in this case would have been prevented. So again, on this record no reasonable jury could conclude that any deficiencies in these areas were moving forces behind any constitutional violations that may have occurred in this case.

The plaintiff contends that a "code of silence" exists among officers of the Milwaukee Police Department, under which officers refuse to report potential wrongdoing by other officers to their superiors. The existence of a code of silence would support a claim for municipal liability if the municipality either encouraged its officers to adhere to the code or was aware of the code's existence and recklessly failed to take obvious measures to prevent officers from following it, and if the code's existence was the moving force behind the deprivation of the plaintiff's rights. See Blair v. City of Pomona, 223 F.3d 1074, 1080 (9th Cir. 2000); McGregory v. City of Jackson, 335 F. App'x 446, 449 (5th Cir. 2009). In the present case, the plaintiff has not produced evidence from which a reasonable jury could conclude either that the City of Milwaukee encouraged its officers to follow a code of silence or recklessly failed to take obvious measures to combat any code of silence that may have existed. Moreover, the plaintiff has not produced admissible evidence from which a reasonable jury could conclude that a code of silence existed in the first place. The evidence the plaintiff cites to establish the existence of such a code consists of statements in newspaper articles and other forms of inadmissible hearsay that could not

---

disciplined Seitz for lying, it would have had no effect on what happened to Ragland.

be presented to the jury at trial. See Pl. PFOF ¶¶ 237–243. Finally, even if a code of silence existed and municipal policymakers were aware of it, the plaintiff has not demonstrated any causal connection between the code of silence and any of the constitutional violations that may have occurred in this case.

Accordingly, the City of Milwaukee is entitled to summary judgment.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 32) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file a first amended complaint (ECF No. 31) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to cite supplemental authority (ECF No. 50) is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties' motions to file certain materials under seal (ECF Nos. 51 & 57) are **GRANTED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 20th day of April, 2015.

                                                  s/ Lynn Adelman

                                              LYNN ADELMAN
                                              District Judge